169 Cal.App.4th 199 (2008)
THE PEOPLE, Plaintiff and Respondent,
v.
RICHARDO MARTINEZ et al., Defendants and Appellants.
No. B194836.
Court of Appeals of California, Second District, Division One.
December 16, 2008.
*202 Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Richardo Martinez.
Donald R. Tickle, under appointment by the Court of Appeal, for Defendant and Appellant Jesse Martinez.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

*203 OPINION
ROTHSCHILD, J. 
Richardo Martinez and Jesse Martinez appeal from their convictions on two counts of murder and one count of attempted murder.[1] The trial court instructed the jury that it could find Richardo and Jesse guilty of the murders and the attempted murder if the jury found that (1) they aided and abetted a breach of the peace or a misdemeanor assault and (2) the murders and the attempted murder were "natural and probable consequences" of the crimes that they aided and abetted.
On appeal, Richardo and Jesse argue that the trial court erred by so instructing the jury because the record does not contain substantial evidence that the murders and the attempted murder were natural and probable consequences of the alleged breach of the peace or the alleged misdemeanor assault. We agree, and we further conclude that it is reasonably probable that Richardo and Jesse would have obtained a more favorable result were it not for the trial court's error. We therefore reverse.

BACKGROUND
The amended information charged Richardo, Jesse, and a third codefendant, Saul Rivera, with the murders of Miguel Zapata (count 1) and David Zapata (count 2) in violation of Penal Code section 187, subdivision (a),[2] and with the attempted murder of Edwin Leiva in violation of section 187, subdivision (a), and section 664 (count 3). The information alleged with respect to all counts that the murders and the attempted murder were willful, deliberate, and premeditated within the meaning of section 664, subdivision (a), and were serious felonies within the meaning of section 1192.7, subdivision (c). It further alleged with respect to counts 1 and 2 the special circumstances of multiple murders (§ 190.2, subd. (a)(3)) and that the murders were intentional killings committed by defendants while they were active participants in a criminal street gang and for the purpose of furthering the activities of the gang (§ 190.2, subd. (a)(22)). As to all counts and all defendants, the information alleged that a principal personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b), (c), (d), (e)(1)), and that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)).
*204 Richardo and Jesse pleaded not guilty and denied the allegations. Their trial was severed from Rivera's. A jury found both Richardo and Jesse guilty on all counts and found all allegations true except (1) the intentional killing by a gang member special circumstance was found not true as to both Richardo and Jesse, and (2) the multiple-murders special circumstance was found true as to Jesse but not true as to Richardo.[3]
The trial court sentenced Richardo to 50 years to life on count 1, consisting of 25 years to life for the murder and a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). The court imposed an identical sentence of 50 years to life on count 2, to run concurrently with the sentences on counts 1 and 3. The court imposed a sentence of 25 years to life on count 3, to run concurrently with the sentences on counts 1 and 2. The court also ordered victim restitution of $9,876.30 (§ 1202.4, subd. (f)), imposed a restitution fine of $2,000 (§ 1202.4, subd. (b)), and imposed but stayed a parole revocation fine of $2,000 (§ 1202.45). The court credited Richardo with 632 days of presentence custody.
The trial court imposed identical sentences and fines on Jesse except that the sentences on counts 1 and 2 are to run consecutively, giving Jesse an aggregate term of 100 years to life. The court also credited Jesse with 632 days of presentence custody.
The evidence introduced at trial showed the following facts:[4] On February 2, 2005, at roughly 5:30 p.m., George Ortega was seated outside at a Wienerschnitzel restaurant in Canoga Park. His girlfriend Lisa Anderson and his friends David Zapata, Miguel Zapata, and Edwin Leiva were with him; some were seated, while others were standing. Ortega was a member of a street gang, the Vanowen Street Locos. David and Miguel were members of the Temple Street gang.
At some point, Richardo came out of a store across the street, crossed to the Wienerschnitzel, and walked past the tables and then back again, fixing Ortega's group with a disrespectful stare that Ortega interpreted as a challenge. Richardo walked away and conferred briefly with Jesse and Rivera, *205 who had just come out of the same store and crossed the street. Richardo, Jesse, and Rivera then came toward Ortega's group. Ortega testified that Rivera approached Miguel and asked him, "Where are you from?" (meaning, in this context, "What gang do you belong to?"). Miguel responded by identifying the gang of which he was a member, "Temple Street." Rivera replied "Fuck Temple" and identified his own gang as "Canoga Park," while Richardo and Jesse stood behind him and made hand signals indicating that they too were members of the Canoga Park Alabamas street gang. Ortega stood up and stated his own gang affiliation as "Calle Vanowen" (Spanish for "Vanowen Street"). Rivera then pulled out a handgun and "started shooting." During the shooting, Richardo and Jesse continued to make hand signals indicating they were Canoga Park Alabamas.
Miguel and Leiva ran. David was shot where he sat, and he fell to the ground. Gunfire shattered the window of a nearby restaurant as Leiva ran past it. Ortega jumped over some bushes, dropped to the ground, and "played dead." After the shooting stopped, Rivera, Richardo, and Jesse fled the scene. Ortega approached David and found that he had been shot in the head. Miguel went to the cashier of the Wienerschnitzel and asked that someone "call the cops"; then he collapsed. The medical examiner testified that David died from a gunshot wound to the head. Miguel died from a gunshot wound to his torso; he suffered three additional gunshot wounds to various parts of his body.
In its case-in-chief, the prosecution presented four expert witnesses on criminal street gangs: Ortega and police officers Steve Park, Foster Rains, and Joshua Lukaszewski, all of whom were assigned to the Los Angeles Police Department's west valley division, which includes Canoga Park. After the prosecution rested, the defense presented its own gang expert, Roberto Lacarra. The prosecution then presented one more gang expert, police officer Gary Nanson, in rebuttal. Nanson oversees the west valley division, among others.
Ortega testified that (1) disrespectful staring and other gang challenges "most likely" lead to "an argument or a fist fight"; (2) in the circumstances of this case, he thought the "Where are you from?" challenge was going to lead to a fistfight; (3) he "didn't expect" a gun to be used, "didn't think there was going to be any kind of shoot-out," and "felt startled" when the gun was drawn; and (4) when Rivera took out the gun, Richardo and Jesse looked "startled and surprised" too.[5]
*206 Park testified that (1) in the majority of gang-related violent crimes he investigates, the violence is preceded by the words "Where are you from?"; (2) "many" of those confrontations end in murder, and the sequence from "Where are you from?" to murder forms "a common or a classic pattern"; (3) he does not keep any statistics concerning what was said just before a shooting or murder; (4) he estimated that in the last four years he has investigated 10 to 15 crimes in which "one group walks up to another group, face-to-face," asks "Where are you from?," and then fires at the group "when they say where they're from"; (5) gang members pose the challenge "Where are you from?" probably 2,000 to 3,000 times each year; (6) in the four years that he has been working in the west valley division, he recalls perhaps three or four fistfights that escalated into shootings, but none in Canoga Park.
Rains, who is a homicide detective, testified that (1) "the majority of the murders" he has investigated were preceded by a "Where are you from?" challenge; (2) "from my experiences, a large majority of the ones that are challenged, at least from West Valley that I've been working, have led to shootings and major injuries, attempt murders[, and murders]"; (3) in the west valley, there were approximately 15 murders in 2005, of which approximately 10 were gang related; (4) gang challenges are "common" and "probably" happen several times each day; (5) the Los Angeles Police Department does not keep statistics on how often "Where are you from?" challenges occur; and (6) Rains could only "guess[]" at how many occur in the course of a year.
Lukaszewski testified that (1) when a member of a rival gang or any other gang enters the Canoga Park Alabamas' territory, "[a]nything could happen, up to nothing, up to a killing"; (2) gang challenges "often lead to violence"; (3) the challenge "Where are you from?" "usually" leads to "some sort of violence or some type of confrontation," and he has "been involved in numerous investigations where those very words led to murder"; (4) the fact pattern in this casein which one gang member first walks past the victims, stares disrespectfully, and then meets up with two fellow gang members, and the three then approach the victims, ask where they are from, insult them, and then draw a gun and open fireis a "common" and "typical" "type of gang confrontation"; and (5) gang members "almost always" "bring weapons with them" when they confront suspected rival gang members, and failure to do so "could be" a "suicide mission."
Lacarra testified for the defense that (1) when gang members fight, it is "not likely" that a weapon will be used; (2) "Where are you from?" challenges occur in the valley "5, 10, 20 times a day" "at a minimum," and *207 the total in one year could "easily" be 10,000 and is "probably" more like 20,000; (3) a "very low percentage" of them result in murder; (4) a confrontation like the one in this caseincluding the disrespectful staring, the "Where are you from?" challenge, and the insulting response to Miguel's identification of his gang"usually" results in a fistfight, and "it's rare" for such a confrontation to result in either assault with a deadly weapon or murder; (5) over a five-year period, there have been an average of 175 gang-related murders in the valley per year; and (6) not every member of a gang knows every other member, so a gang member might ask "Where are you from?" and find out that the person is a member of his own gang.
Nanson testified in rebuttal that (1) most of the gang assaults and homicides that his personnel investigate were "precipitated" by "Where are you from?" challenges; (2) in 2004, there were 42 "gang homicides" in the valley, and there were 38 in 2005; (3) "most gang members" in a gang the size of the Canoga Park Alabamas "tend to know one another"; (4) it is "possible" for a gang member to ask "Where are you from?" and find out that the person is a member of his own gang; and (5) when a member of a different gang comes into the neighborhood of a territorial gang like the Canoga Park Alabamas, "what would logically happen" is "violent confrontations."
In their postarrest interviews (tapes of which were played for the jury), both Richardo and Jesse identified Rivera as the shooter. Richardo claimed that he, not Rivera, was the one who asked Ortega's group where they were from and responded "Fuck Temple Street" when Miguel stated his gang affiliation. Jesse admitted approaching Ortega's group with Rivera. Richardo denied knowing that Rivera was carrying a gun. Jesse said he "was scared someone was going to take out a gun." When asked "[W]ho? The other guy?", he responded "Anybody. I'm scared. Because I was right there." Jesse said nothing indicating that he had reason to believe Rivera was armed on the night in question, but he admitted having handled Rivera's gun one week earlier.
The prosecution sought to convict Richardo and Jesse on either of two alternative theories, both of which were covered by the trial court's instructions to the jury.[6] First, the prosecution argued that they were guilty as aiders and abettors of both the murders and the attempted murder because they acted with the intent or purpose of encouraging or facilitating their commission. Second, the prosecution argued that if Richardo and Jesse did not intend *208 to encourage or facilitate murder or attempted murder, they were still guilty as aiders and abettors because the murders and the attempted murder were natural and probable consequences of any one of four other offenses that, the prosecution argued, Richardo and Jesse did intentionally encourage or facilitate, namely, (1) disturbing the peace, (2) assault, (3) assault with a deadly weapon, and (4) assault with force likely to produce great bodily injury. For reasons we explain in part II., post, it appears that the jury convicted Richardo and Jesse on the basis of a natural and probable consequences theory.

DISCUSSION

I. Instructional Error
(1) The trial court errs if it instructs the jury on a theory of liability that is not supported by substantial evidence. (People v. Guiton (1993) 4 Cal.4th 1116, 1129 [17 Cal.Rptr.2d 365, 847 P.2d 45].) Richardo and Jesse argue that the trial court erred when it included disturbing the peace and simple assault as target crimes in the instruction on aider and abettor liability for natural and probable consequences, because "murder is not a natural and probable consequence of misdemeanor assaults or breaches of the peace." On the evidentiary record in this case, we agree.
As a threshold matter, respondent argues that both Richardo and Jesse waived the error by agreeing to the instruction at issue. We disagree.
During the prosecution's case-in-chief, Richardo objected to the inclusion of breach of the peace and simple assault in the list of target crimes in the natural and probable consequences instruction. After the prosecution rested, both Richardo and Jesse moved for judgment of acquittal on the ground that the record contained insufficient evidence that murder was a natural and probable consequence of simple assault or breach of the peace. The trial court denied the motion. Thereafter, the defense and the prosecution agreed to the natural and probable consequences instruction that was ultimately given to the jury.
(2) Respondent cites no authority for the proposition that when a defendant agrees to an instruction after unsuccessfully objecting to it and unsuccessfully moving for judgment of acquittal on the ground that the instruction is unsupported by substantial evidence, the defendant waives the issue. We are aware of no such authority, and there is ample authority to the contrary. (See, e.g., People v. Viramontes (2001) 93 Cal.App.4th 1256, 1264 [115 Cal.Rptr.2d 229] [no invited error when defense counsel initially opposes but ultimately acquiesces in trial court's ruling]; Mary M. v. City of Los Angeles (1991) 54 *209 Cal.3d 202, 212-213 [285 Cal.Rptr. 99, 814 P.2d 1341]; Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn. (1992) 4 Cal.App.4th 1538, 1555 [6 Cal.Rptr.2d 698]; Williamson v. Pacific Greyhound Lines (1949) 93 Cal.App.2d 484, 487-488 [209 P.2d 146].) Moreover, because the instruction affected Richardo's and Jesse's substantial rights, we would be permitted to review the instruction even if the defense had failed to object to it in the trial court. (§ 1259; People v. Dennis (1998) 17 Cal.4th 468, 534-535 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)
(3) We therefore turn to the merits. "[A] defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the `natural and probable consequence' of the target crime." (People v. Prettyman (1996) 14 Cal.4th 248, 261 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) "[T]o convict a defendant of a crime under this doctrine, the jury need not unanimously agree on the particular target crime the defendant aided and abetted. [Citations.]"[7] (14 Cal.4th at pp. 267-268.)
In order to find a defendant guilty on a "natural and probable consequences" theory, the jury "must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime[;] ... [and] that (4) the defendant's confederate committed an offense other than the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (People v. Prettyman, supra, 14 Cal.4th at p. 262, fn. omitted.) A charged crime is a natural and probable consequence of a target crime if, given the circumstances of the commission of the target crime, the commission of the charged crime was reasonably foreseeable. (Id. at p. 261; see also People v. Mendoza (1998) 18 Cal.4th 1114, 1133 [77 Cal.Rptr.2d 428, 959 P.2d 735]; see generally 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 82, pp. 131-132.) The standard is an objective one: "The ... question is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable. [Citation.]" (People v. Mendoza, supra, 18 Cal.4th at p. 1133.) Whether a charged crime is a natural and probable consequence of a target crime is a question of fact. (People v. Nguyen (1993) 21 Cal.App.4th 518, 531 [26 Cal.Rptr.2d 323].)
*210 The trial court instructed the jury that "[e]very person who ... [u]nlawfully fights, challenges another person to fight in a public place[,] or ... [i]n a public place directs at one or more persons offensive words which are inherently likely to provoke an immediate violent reaction is guilty of breach of peace." (Cf. § 415.) The instructions further defined "offensive words" as "speech which constitutes a clear and present danger of provoking others to immediate violence." The court further instructed the jury that every person who (1) "willfully commit[s] an act which by its nature would probably and directly result in the application of physical force on another person," (2) is "aware of facts that would lead a reasonable person to realize that as a direct, natural and probable result of this act ... physical force would be applied to another person," and (3) at the time of the act "had the present ability to apply physical force to the person of another" is guilty of a misdemeanor assault. (Cf. § 240.)
The record contains substantial evidence from which a reasonable jury could have concluded beyond a reasonable doubt that Richardo and Jesse aided and abetted the crimes of breach of the peace and assault. The evidence shows that Richardo and Jesse encouraged or facilitated Rivera's posing of the "Where are you from?" challenge by approaching Ortega's group with Rivera and identifying themselves, through hand signals, as members of the same gang as Rivera. The evidence also shows that gang challenges "often lead to violence" and that the challenge "Where are you from?" in particular "usually" leads to "some sort of violence or some type of confrontation." The jury therefore could have reasonably concluded that intentionally encouraging such a verbal challenge constituted intentionally encouraging a breach of the peace or an assault. Thus, the record contains sufficient evidence to support a finding that Richardo and Jesse intentionally encouraged or facilitated a breach of the peace or an assault by encouraging or facilitating Rivera's posing of the verbal challenge, "Where are you from?"
Consequently, the question before us is: Does the evidence support an inference that, under the circumstances presented in this case, a shooting or a homicide (or an attempted homicide) was a natural and probable consequence of the verbal challenge? We conclude that the evidence does not support such an inference.
The prosecutor's closing argument to the jury provides a useful starting point for our analysis. In her argument concerning natural and probable consequences, the prosecutor alluded to the evidence that "Where are you from?" challenges are extremely common and that a very small proportion of them result in homicide, but the prosecutor told the jury, "That's not the *211 question," so the jury should not "be misled" or "be distracted by all the mess." Rather, according to the prosecutor, the question is whether "the majority of gang-related murders" are preceded by "Where are you from?" challenges. The prosecutor argued that "it's been uncontroverted in this case" that they are, and that murder is therefore a natural and probable consequence of such a challenge.
(4) The prosecutor's argument was unsound. The factual proposition on which the prosecutor reliedthat the majority of gang-related murders are preceded by "Where are you from?" challengesis indeed supported by substantial evidence, but it is irrelevant to determining whether murder is a natural and probable consequence of such a challenge. For murder to be a natural and probable consequence, it must be reasonably foreseeable. (See People v. Mendoza, supra, 18 Cal.4th at p. 1133.) If, for example, only one in a million "Where are you from?" challenges results in a murder, then an individual posing such a challenge could not reasonably foresee that a murder will follow, even if nearly all gang-related murders are preceded by such challenges. Conversely, if nine out of 10 "Where are you from?" challenges result in murders, then an individual posing such a challenge could reasonably foresee that a murder will follow, even if most gang-related murders are not preceded by such challenges. Either way, the proportion of gang-related murders that are preceded by "Where are you from?" challenges has no tendency to prove that murder is or is not a natural and probable (i.e., reasonably foreseeable) consequence of such a challenge. In short, what matters is the proportion of challenges that result in killings, not the proportion of killings that were preceded by challenges.
The prosecutor did not attempt to argue that the evidence met the proper standard, i.e., that the evidence showed that a shooting or homicide was a sufficiently likely result of a "Where are you from?" challenge as to be reasonably foreseeable by someone posing such a challenge. Nor could an argument to that effect have succeeded.
For example, Ortega testified for the prosecution as a gang expert, and his testimony had no tendency to prove that a shooting or homicide was a natural and probable consequence of a "Where are you from?" challenge; rather, it tended to prove the opposite. He testified that (1) gang challenges "most likely" lead to "an argument or a fist fight"; (2) in the circumstances of this case, he thought the "Where are you from?" challenge was going to lead to a fistfight; (3) he "didn't expect" a gun to be used, "didn't think there was going to be any kind of shoot-out," and "felt startled" when the gun was drawn; and (4) when Rivera took out the gun, Richardo and Jesse looked "startled and surprised" too. Although the issue before us concerns what was objectively reasonably foreseeable, rather than the subjective expectations of *212 any particular individual, Ortega's own expectations, as a gang expert, constitute circumstantial evidence of what was objectively reasonably foreseeable under the circumstances. Ortega's testimony concerning the reactions of Richardo and Jesse, both of whom identified themselves as members of the Canoga Park Alabamas and both of whom, according to Ortega, looked "startled and surprised" when the gun came out, likewise tends to show that a shooting was not reasonably foreseeable.
The testimony of the other gang experts likewise lent no support to a finding that a shooting or homicide is a natural and probable consequence of a "Where are you from?" challenge. The prosecution's experts testified that such challenges are "common" and "probably" happen several times each day (Rains) or 2,000 to 3,000 times per year (Park), but any estimate would really be just a "guess[]" (Rains) because there are no official statistics. The prosecution's rebuttal expert (Nanson) also testified that there were 42 gang-related homicides in the valley in 2004 and 38 in 2005. The defense expert (Lacarra) put the number of gang-related homicides much higher (175), but his estimate of the number of "Where are you from?" challenges was also dramatically higher ("easily" 10,000, and "probably" more like 20,000). No combination of any of those statistics adds up to substantial evidence that a shooting or a homicide is a reasonably foreseeable consequence of a "Where are you from?" challenge. And, again, the prosecutor did not attempt to argue to the contrary.[8]
As we have already noted, the experts' testimony did show that some sort of violence is a likely outcome of a "Where are you from?" challenge. Lukaszewski, for example, testified that gang challenges "often lead to *213 violence" and, in particular, the challenge "Where are you from?" "usually" leads to "some sort of violence or some type of confrontation." But "violence" could be nothing more than a fistfight, which is the outcome Ortega expected in this case. Thus, testimony that "violence" is a likely result of a "Where are you from?" challenge has no tendency on its own to prove that a shooting or other potentially lethal conduct is a likely result of the challenge. According to the experts, "Where are you from?" challenges are common and often result in gang-related violence, but gang-related homicides are radically less common. Moreover, Park testified that in his four years in the west valley he recalls perhaps three or four fistfights that escalated into shootings, none of them in Canoga Park. But another prosecution witness, a school police officer at Canoga Park High School who "specifically targeted gang members" and was familiar with over 100 members of the Canoga Park Alabamas, testified that "40 to 50 fights" occur at the school in any given semester.[9]
For similar reasons, the prosecution's evidence concerning gang members' propensity to carry weapons does not show that a shooting or homicide was a reasonably foreseeable consequence of a "Where are you from?" challenge. The prosecution's experts testified, for example, that "guns are commonly found in the possession of gang members" (Nanson), that gang members are often armed when they "patrol" their territory (Lukaszewski), and that gang members are often armed when they challenge rival gang members (Lukaszewski).[10] Such testimony might be sufficient to support an inference that a shooting or homicide is a possible consequence of a gang confrontation. But the testimony cannot sustain an inference that a shooting or homicide is a natural and probable (or reasonably foreseeable) consequence of asking "Where are you from?," because the testimony gives no indication of the likelihood that gang members will use their weapons (whatever they might be) in any particular circumstance. (Cf. Redfoot v. J. T. Jenkins Co. (1955) 138 Cal.App.2d 108, 119 [291 P.2d 134] [a consequence is not reasonably foreseeable if it is "`merely possible'"].) The inadequacy of the *214 testimony is highlighted by (1) the prosecution's experts' consistent failure to give any indication of the likelihood that a shooting or homicide will result from a "Where are you from?" challenge, (2) the absence of any direct evidence that, of the six gang members involved in this incident, any but the shooter was armed, and (3) Ortega's testimony concerning both his own expectations concerning the confrontation in this case and the reactions of the shooter's confederates.[11]
Our review of the record thus leads us to conclude that the evidence introduced at trial was not sufficient to allow a reasonable jury to find that a shooting or homicide was a natural and probable consequence of a "Where are you from?" challenge under the circumstances of this case. Moreover, in the context of this case aiding and abetting the "Where are you from?" challenge was sufficient to constitute aiding and abetting the target crimes of simple assault or disturbing the peace. It was therefore error for the trial court to include those target crimes in the instruction on aider and abettor liability for natural and probable consequences.
We wish to emphasize that our analysis is necessarily limited to the evidence presented in the case before us. A substantial portion of our discussion addresses statistical evidence, but that is because much of the relevant evidence introduced in this case was statistical. We do not require that the prosecution use statistical evidence to prove that a charged offense is a natural and probable consequence of a target offense. We also have focused primarily on the "Where are you from?" challenge itself rather than on certain surrounding circumstances, such as the disrespectful staring that preceded the challenge and the insulting response that followed Miguel's identification of his gang. But the reason for our focus on the challenge rather than on those other circumstances is that the record contains no evidence about the extent to which those circumstances made a shooting or homicide more likely, or likely at all. (See fn. 9, ante.) If nearly all "Where are you from?" challenges are preceded by such staring and followed by such verbal taunts, but they still almost always lead to fistfights rather than potentially lethal conduct, then the existence of the staring and taunts in this case does not make homicide a reasonably foreseeable consequence. Again, what is *215 needed is evidence that, in those circumstances, murder was reasonably foreseeable. The record in this case contains no such evidence.
We note that a number of other cases have dealt with homicide convictions on natural and probable consequences theories, but none of them is controlling here. In People v. Montano (1979) 96 Cal.App.3d 221 [158 Cal.Rptr. 47], the trier of fact determined that the defendants had agreed "`to waste'" the victim, who was a member of a rival gang. (Id. at p. 226, fn. 2.) Here, there is no evidence of such an agreement.
In People v. Godinez (1992) 2 Cal.App.4th 492 [3 Cal.Rptr.2d 325], the defendant participated in a direct, violent attack on rival gang members, resulting in a homicide. (Id. at pp. 495-496.) That case consequently does not address the issue before us, namely, whether a shooting or homicide was a natural and probable consequence of the verbal challenge "Where are you from?"[12]
People v. Olguin (1994) 31 Cal.App.4th 1355 [37 Cal.Rptr.2d 596], is distinguishable for similar reasonsthe defendant admittedly participated in a violent attack on an individual who had "disrespected" his gang, resulting in a homicide. (Id. at pp. 1375-1376.) Likewise, in People v. Montes (1999) 74 Cal.App.4th 1050 [88 Cal.Rptr.2d 482], the defendant attacked the victim (a former member of a rival gang) with a deadly weapon. (Id. at pp. 1053-1054.) In People v. Gonzales (2001) 87 Cal.App.4th 1 [104 Cal.Rptr.2d 247], all of the defendants participated in a violent attack on the victim. (Id. at pp. 6-7, 11.) And in People v. Karapetyan (2006) 140 Cal.App.4th 1172 [45 Cal.Rptr.3d 245], the defendant and his son "were carrying sharp metallic items," the defendant struck the victim, and there was substantial evidence that the defendant hit the victim "with the metallic object" and that he was carrying "both a gun and a knife." (Id. at p. 1175; see also id. at p. 1177 ["The evidence showed a group of men challenging a single unarmed victim with an assortment of weapons available for their use."].) Again, because of their different factual circumstances, not one of those cases addresses the issue of whether a shooting or homicide is a natural and probable consequence of the verbal challenge "Where are you from?"[13]
*216 We realize that the existence of appellate cases in which "Where are you from?" challenges have led to homicide might, in itself, make it tempting to conclude that homicide is a reasonably foreseeable consequence of such challenges. We believe, however, that the temptation must be resisted. The existence of those cases certainly shows that homicide is a possible consequence. But it does not show that homicide is a natural and probable consequence, because the challenges that lead to criminal prosecution and appeal might not be a representative sample of challenges in general. Indeed, the record in this case contains evidence that they are not a representative sample. Ortega, an admitted gang member and a witness for the prosecution concerning the murders of his friends, testified that "most of the time" a "Where are you from?" challenge leads to "people saying their names and maybe a few bad words, and that's it." If Ortega is right that "Where are you from?" challenges ordinarily result in noncriminal or nonfelonious conduct, then most "Where are you from?" challenges will never come before the Court of Appeal. If the prosecution wishes to contend nonetheless that, in the circumstances of a particular case, murder was reasonably foreseeable, it must introduce evidence sufficient to sustain that contention. The prosecution did not do so in the case before us.
(5) We conclude that the trial court erred when it included disturbing the peace and simple assault as target crimes in the instruction on aider and abettor liability for natural and probable consequences, because the evidence was insufficient to warrant their inclusion.

II. Prejudice
When the trial court instructs the jury on a theory of liability that is not supported by substantial evidence, the error warrants reversal if it is reasonably probable that in the absence of the error the defendant would have obtained a more favorable result. (People v. Guiton, supra, 4 Cal.4th at pp. 1129-1130; see also People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) We agree with Richardo and Jesse that it is reasonably probable that they would have obtained more favorable results were it not for the trial court's error.
The court instructed the jury that Richardo and Jesse could be found guilty either as direct aiders and abettors of the murders and the attempted murder *217 or as aiders and abettors of certain other target crimes of which the murders and the attempted murder were natural and probable consequences. The prosecutor argued both theories to the jury, addressing the natural and probable consequences theory in detail.
The jury found, as to both Richardo and Jesse, that it was not true that they intentionally committed the murders while they were active participants in a criminal street gang and for the purpose of furthering the activities of the gang. The record contains substantial uncontradicted evidence, however, that Richardo and Jesse were Canoga Park Alabamas; for example, Richardo and Jesse used hand signals identifying themselves as Canoga Park Alabamas during the confrontation with Ortega's group. In addition, the jury found that the murders and the attempted murder were willful, deliberate, and premeditated and were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. Consequently, the jury's rejection of the intentional killing by a gang member special circumstance seems to show that, although the jury was persuaded that the shooter intentionally committed the murders, the jury was not persuaded that Richardo and Jesse intended that the murders be committed. The jury therefore appears to have convicted Richardo and Jesse on the basis of a natural and probable consequences theory rather than on a direct aiding and abetting theory.[14]
For similar reasons, the jury's rejection of the intentional killing by a gang member special circumstance suggests that the jury was not persuaded that Richardo and Jesse intended for Rivera to fire his gun, so it is unlikely that the jury found that Richardo and Jesse intended to aid and abet the target crimes of assault with a deadly weapon and assault with force likely to produce great bodily injury. It is therefore likely that the jury convicted them of the murders and the attempted murder by first finding them guilty of aiding and abetting either disturbing the peace, simple assault, or both, and then finding that the murders and the attempted murder were natural and probable consequences of those target offenses. Moreover, as we explained in Part I., *218 ante, there was ample evidence that Richardo and Jesse aided and abetted the commission of those target offenses by approaching with Rivera and making hand signals identifying themselves as members of the same gang as Rivera, thereby encouraging Rivera's "Where are you from?" challenge. As we have also explained, however, the record does not contain sufficient evidence to sustain a jury finding that the murders and the attempted murder were natural and probable consequences of those target offenses.
For all of these reasons, we conclude that it is reasonably probable that Richardo and Jesse would have obtained more favorable results if the trial court had not erred by including disturbing the peace and assault as target offenses in the instruction on natural and probable consequences. The court's error was therefore sufficiently prejudicial to warrant reversal of Richardo's and Jesse's convictions.[15] Our resolution of this issue makes it unnecessary for us to address the remaining arguments raised by the parties.
There is only one further issue that we must address, and it concerns Jesse alone. We began our prejudice analysis by reasoning that the not true findings on the intentional killing by a gang member special circumstance appear to show that the jury was not persuaded that Richardo and Jesse intended that the murders be committed. Respondent argues, however, that the jury must have found that Jesse acted with "intent to kill" because the jury found that the multiple-murders special circumstance was true as to Jesse.[16] We find the argument unconvincing for purposes of our prejudice analysis, because the jury instructions on the special circumstances did not make clear that the multiple-murders special circumstance required a finding of intent to kill.
It is true that as a matter of law, if the jury did not find that Jesse was the actual killer, then it should not have found the multiple-murders special circumstance true unless it also found that Jesse acted with intent to kill. (See § 190.2, subd. (c); see generally 3 Witkin & Epstein, supra, Punishment, § 460, pp. 613-614.) The trial court's instructions to the jury, however, did not make that clear. The instruction on multiple murders (CALJIC No. 8.81.3) said nothing about intent to kill, in contrast to the instruction on *219 intentional killing while an active gang member (CALJIC No. 8.81.22), which expressly required the jury to find that "[t]he defendant intentionally killed the victim...."
The court also gave the jury a general introductory instruction (CALJIC No. 8.80.1) concerning both special circumstances.[17] The third paragraph of that instruction informed the jurors that if they were unable to find that a particular defendant was "the actual killer of a human being," then they could not find "the special circumstance to be true as to that defendant" unless they found the defendant acted "with the intent to kill." But that paragraph of the instruction did not say whether the phrase "the special circumstance" referred to multiple murders, intentional killing by a gang member, or both. Other paragraphs of the same instruction used the phrases "each special circumstance" and "all of the special circumstances" when referring to both, thereby suggesting that the third paragraph's use of the phrase "the special circumstance" did not refer to both. It thus would have been reasonable for the jury to infer that the third paragraph's requirement of "intent to kill" was merely a repetition of the intent element of the intentional killing by a gang member special circumstance. Nothing in the instructions ruled out such an interpretation. Indeed, a prior instruction (CALJIC No. 1.01) advised the jury that sometimes a "rule, direction or idea" might be repeated in the course of the instructions as a whole.
The lack of clarity concerning the intent to kill requirement stems, at least in part, from the trial court's failure to follow the use notes for CALJIC No. 8.80.1. The legal background is as follows: Some special circumstances, such as intentional killing by a gang member, include intent to kill as an element. Others, like multiple murders, do not. But even for those that do not, section 190.2, subdivision (c), independently provides that such special circumstances cannot be found true as to a defendant other than the actual killer unless the jury finds the defendant acted with intent to kill (subject to an exception not applicable here). (See 3 Witkin & Epstein, supra, Punishment, §§ 453, 460, pp. 606-607, 613.)
*220 (6) CALJIC No. 8.80.1, which is a general introductory instruction on special circumstances, includes optional paragraphs dealing with all of the relevant contingencies, i.e., whether the special circumstances in the case include intent to kill as an element and whether the defendant is the actual killer.[18] The use notes then explain when the optional paragraphs should be used or omitted: (1) If the case involves only special circumstances that do include intent to kill as an element, then the third and fourth paragraphs of CALJIC No. 8.80.1 should be omitted, because intent to kill will independently be stated as an element in the specific instructions on the special circumstances at issue; (2) if the case involves only special circumstances that do not include intent to kill as an element, then the third and fourth paragraphs of CALJIC No. 8.80.1 should be included, but the first clause of the third paragraph, which distinguishes between special circumstances that include intent to kill as an element and special circumstances that do not, should be omitted; and (3) if the case involves both special circumstances that include intent to kill as an element and special circumstances that do not, then the third and fourth paragraphs of CALJIC No. 8.80.1 should be used, including the first clause of the third paragraph, which distinguishes between the two types of special circumstances. (See Use Note to CALJIC No. 8.80.1 (Apr. 2006 ed.).) Thus, when properly given in a case involving both types of special circumstance, CALJIC No. 8.80.1 aims to apprise the jury that even for special circumstances that do not include intent to kill as an element, they still must find intent to kill in order to find those special circumstances true as to any defendant other than the actual killer.
Again, this case involves one special circumstance that includes intent to kill as an element (i.e., intentional killing by a gang member) and one that does not (i.e., multiple murders). Accordingly, the trial court should have included the third and fourth paragraphs of CALJIC No. 8.80.1. But the court did not do thatit omitted the third paragraph in its entirety (so the third paragraph of the instruction as given is actually the fourth paragraph of *221 CALJIC No. 8.80.1). As a result, the instruction as given does not distinguish between special circumstances that include intent to kill as an element and those that do not. Consequently, the instruction fails to make clear that the requirement of intent to kill (for any defendant other than the actual killer) applies to special circumstances that do not themselves include intent to kill as an element. Rather, as we explained ante, in the instruction as given it is reasonable to read the requirement of intent to kill as merely a repetition of the intent element of the intentional killing by a gang member special circumstance.[19]
For all of the foregoing reasons, we conclude it is reasonably probable that the jury did not realize that if Jesse was not the actual killer, then the multiple-murders special circumstance could not be found true as to him unless he was found to have acted with intent to kill. Accordingly, we conclude that the true finding with respect to Jesse on the multiple-murders special circumstance does not undermine our reasoning that the not true findings with respect to both defendants on the intentional killing by a gang member special circumstance make it reasonably probable that the jury was not persuaded that Jesse and Richardo acted with intent to kill. Again, the record contains powerful and uncontradicted evidence that Jesse and Richardo were gang members, and the jury found true the allegation that the murders were committed for the benefit of a criminal street gang. But the jury still rejected the intentional killing by a gang member special circumstance as to both defendants. Consequently, it is reasonably probable that the jury found that Richardo and Jesse did not intend that the murders be committed, and it is therefore reasonably probable that the jury convicted both of them on a natural and probable consequences theory.

DISPOSITION
The judgments of conviction are reversed.
Mallano, P. J., concurred.
*222 WEISBERG, J.,[*] Dissenting. 
I believe substantial evidence supported the trial court's instructions on the natural and probable consequences of aiding and abetting the crimes of assault and disturbing the peace, and, even if the trial court erred in this regard, appellants were not prejudiced.

I. INTRODUCTION
The facts here are simple and, unfortunately, all too familiar. Appellants were members of the Canoga Park Alabama gang (CPA). CPA claimed the area at Sherman Way and Loma Verde in Canoga Park, the location of a Wienerschnitzel hot dog stand, as part of its territory. Police testimony described CPA as a street gang that used violence to defend its territory. The primary crimes committed by its members included murders, attempted murders, shootings, assaults with deadly weapons, armed robberies, thefts, drug sales, witness intimidation, carjackings and burglaries.
Appellant Richardo Martinez told police that on the day of the shooting he received a phone call from Saul Rivera and appellant Jesse Martinez[1] to join them at Sherman Way and Loma Verde because "some fools" were "gang-banging" at that location. The three then went to the location and saw George Ortega, Lisa Anderson, Edwin Leiva, and brothers Miguel and David Zapata seated at the hot dog stand. Ortega was a member of the Vanowen Street Locos gang, and David and Miguel Zapata were members of the Temple Street gang. Richardo walked by and "mad-dogged" them (staring at them in a challenging way). Richardo then walked over to Jesse and Rivera and the three spoke. The three then approached the hot dog stand. Richardo told police he then asked: "Where are you from?" The reply was "Temple Street." Richardo then told police that he flashed the "C" hand sign and said "Canoga Park" and "Fuck Temple Street."[2] Rivera then pulled a gun from his waistband and started firing. During the shooting, Richardo and Jesse continued to make CPA gang signs. Ortega described both Jesse and Richardo as having "startled" looks on their faces, apparently at the same time they were flashing their gang's signs. Both Miguel and David Zapata were fatally wounded. Appellants and Rivera then fled, with Rivera and Jesse disposing of the gun.
*223 Richardo ran home. Jesse and Rivera went to the apartment of a friend. Jesse telephoned someone and said he was in trouble. Both Jesse and Rivera washed their hands and changed clothes and then left.
Jesse told the police that he had seen and handled Rivera's gun one week before the murders. He also told the police he "was scared someone was going to take out a gun" during the confrontation. Richardo told the police that he did not know Rivera had a gun.
The jury was instructed on first and second degree murder, attempted murder, on liability for aiding and abetting the charged crimes of murder and attempted murder, and aiding and abetting the target crimes of assault by means of force likely to produce great bodily injury, assault with a firearm, simple assault and disturbing the peace. The jury was also instructed on the lesser included offense of involuntary manslaughter.[3]
The jury convicted appellants of two counts of first degree murder and one count of attempted premeditated murder. The jury also found true the allegations that the crimes were committed for the benefit of a criminal street gang pursuant to Penal Code[4] section 186.22, subdivision (b)(1)(C), and allegations regarding use of a firearm pursuant to sections 12022.53, subdivisions (a) and (e)(1); 12022.53, subdivisions (c) and (e)(1); and 12022.53, subdivisions (b) and (e)(1). As to Jesse, the jury found true the multiple-murder special circumstance; the jury found this allegation not true as to Richardo. The jury found the special circumstance allegation pursuant to section 190.2, subdivision (a)(22) that the murders were committed for the benefit of a criminal street gang not true as to both appellants.
Several experts on Los Angeles street gangs testified. Detective Lukaszewski was assigned to the Los Angeles Police Department West Valley Gang Enforcement Detail to monitor the activities of the CPA. He testified that gang members almost always bring weapons with them when they confront individuals who are perceived as rival gang members because they know that the rivals carry guns and are usually violent, and it could be suicide not to bring a weapon when confronting rival gang members. He testified that the Vanowen Street Locos would be considered rivals of CPA. He also testified that most gang members would not step down from a challenge because it would show disrespect for their own gang. Detective Lukaszewski testified "Where are you from" is a threatening challenge that usually results in violence, including murder.
*224 Sergeant Rains, a homicide detective, testified that, based upon his experience and what he had been told by gang members: "Depending on the type of gang that may make the challenge, it may just lead to a fist fight. But from my experiences, a large majority of the ones that are challenged, at least from West Valley that I've been working, have led to shootings and major injuries, attempt[ed] murders [and murders]."
Roberto Lacarra, a community college professor and former probation officer who has worked with gangs and has studied gang culture, testified for the defense. He had never testified as an expert before. He testified that "Where are you from" is often a greeting or a way of determining whether the individual confronted was a member of a rival gang or from the inquirer's gang. He testified that "Where are you from" confrontations rarely lead to deadly violence. Most likely a fistfight results from confrontations between rival gangs. He opined that the confrontation here would usually result in a fistfight. He estimated that there are 10,000 to 20,000 "Where are you from" confrontations each year in Los Angeles.
Officer Rodolfo Perez worked for the Los Angeles School Police at Canoga Park High School. He knew appellants and Rivera as members of CPA who hung out together. He saw appellant Richardo on campus the day before the shooting when there was a fight on the west side of the campus. He testified that there was a lot of tension between valley gangs and inner-city rival gangs, and CPA members would constantly engage in fights to maintain their territory.
George Ortega, the Vanowen Street Locos gang member who had been confronted by appellants and Rivera, also testified as an expert. He testified that he knew that he risked "shootings, fights and violence" by being in CPA territory. He also testified that he anticipated a fight was going to result from the confrontation.

II. DISCUSSION

A. There Was No Instructional Error
The general principles relating to natural and probable consequence aider and abettor liability are not in dispute: "The trial court should grant a prosecutor's request that the jury be instructed on the `natural and probable consequences' rule only when (1) the record contains substantial evidence that the defendant intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant's confederate was a `natural and probable consequence' of the specifically contemplated target offense. If this test *225 is not satisfied, the instruction should not be given, even if specifically requested." (People v. Prettyman (1996) 14 Cal.4th 248, 269 [58 Cal.Rptr.2d 827, 926 P.2d 1013].)
"[A]lthough variations in phrasing are found in decisions addressing the doctrine`probable and natural,' `natural and reasonable,' and `reasonably foreseeable'the ultimate factual question is one of foreseeability. [Citations.] `A natural and probable consequence is a foreseeable consequence' [citations]; the concepts are equivalent in both legal and common usage." (People v. Coffman and Marlow (2004) 34 Cal.4th 1, 107 [17 Cal.Rptr.3d 710, 96 P.3d 30].)[5]
On appeal the substantial evidence test is used to determine whether instructions on a particular theory of guilt should have been given. "The test for determining whether instructions on a particular theory of guilt are appropriate is whether there is substantial evidence which would support conviction on that theory. (People v. Houts (1978) 86 Cal.App.3d 1012, 1019 [150 Cal.Rptr. 589].) To determine whether there is substantial evidence to support a conviction we must view the record in a light most favorable to conviction, resolving all conflicts in the evidence and drawing all reasonable inferences in support of conviction. We may conclude that there is no substantial evidence in support of conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant to be *226 guilty on the theory presented. [Citation.]" (People v. Nguyen (1993) 21 Cal.App.4th 518, 528-529 [26 Cal.Rptr.2d 323].) "Evidence, to be `substantial' must be `of ponderable legal significance ... reasonable in nature, credible, and of solid value.' [Citations.]" (People v. Johnson (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738]; see also People v. Campbell (1994) 25 Cal.App.4th 402, 408-409 [30 Cal.Rptr.2d 525].)
I agree with the majority that there was substantial evidence to support a finding that appellants aided and abetted in the crimes of murder and attempted murder. Applying an objective test, this same substantial evidence supports the reasonable inference that it was foreseeable that the conduct of appellants, whether characterized by the jury as disturbing the peace, assault, assault with a deadly weapon or assault by means of force likely to produce great bodily injury, would lead to deadly violence. "For a criminal act to be a `reasonably foreseeable' or a `natural and probable' consequence of another criminal design it is not necessary that the collateral act be specifically planned or agreed upon, nor even that it be substantially certain to result from the commission of the planned act." (People v. Nguyen, supra, 21 Cal.App.4th at p. 530.)
Rivera and appellants, CPA gang members who hung out together, approached members of rival gangs, who were encroaching on CPA territory. Richardo described for the police how he taunted the victims in a way that could only be described as intending to provoke violence. Jesse said he had seen Rivera with a gun one week before and was afraid someone would pull out a gun. A reasonable jury could infer that Jesse believed a firearm would be produced by either Richardo or Rivera. Rivera pulled out a gun and started firing as appellants flashed their gang signs behind him.[6] Viewed objectively, deadly violence was reasonably foreseeable. This evidence adequately supported the trial court's instructions on the target crimes of assault with a deadly weapon, assault by means of force likely to produce great bodily injury, assault and disturbing the peace.
The majority opinion attempts to extrapolate the likelihood of deadly violence in street gang confrontations. It is unrealistic, however, to expect the parties in litigation such as this to have statistically reliable information as to how many "Where are you from" confrontations occur in a specific time period or precisely how many lead to deadly violence. The witnesses' estimates of the number of times such challenges occur were speculative. Each confrontation is different and has to be evaluated on its facts. A *227 confrontation on a school playground is different from a confrontation at a rival gang's hangout. Some gangs are more violent than others.
The majority opinion states that if only one in one million "Where are you from challenges" results in murder then the murder is not reasonably foreseeable; if there is evidence presented that nine of 10 "Where are you from challenges" result in murder then deadly force is reasonably foreseeable. The majority sets the standard much too high in attempting to allocate statistical odds to the issue. What if three in 10 confrontations result in deadly violence? What if one in 10? Would not deadly violence still be reasonably foreseeable? The use of this sort of analysis invites future litigation in which the parties would attempt to introduce evidence of the odds of an event occurring and then measure that against the numbers put forth by the majority here. The real test to determine whether deadly violence was reasonably foreseeable, however, is found in an objective appraisal of the facts of the individual confrontation rather than computation of the odds based upon unreliable statistics.
As I see it, deadly violence was a reasonably foreseeable consequence of the confrontation here regardless of which target crime the jurors found the appellants aided and abetted, and the trial court did not err in so instructing.

B. Assuming Error, There Was No Prejudice
Assuming that the trial court erred, the error was not prejudicial since it is not reasonably probable appellants would have obtained a more favorable result had instructions on the target crimes of assault and disturbing the peace not been given. "In determining whether there was prejudice, the entire record should be examined, including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict. [Citation.] Furthermore, instruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict. We thus adopt the following test.... [T]he appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (People v. Guiton (1993) 4 Cal.4th 1116, 1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].)
The majority concludes that the trial court's instructions on the target crimes of simple assault and disturbing the peace require reversal. This conclusion is based upon the jury's finding as to each appellant that the allegation of an "intentional killing by an active street gang member" *228 pursuant to Penal Code section 190.2, subdivision (a)(22) was not true. The majority concludes that the jury's finding that this allegation was not true suggests that the jury did not find that either appellant intended to kill. The majority then reasons that the jury must have relied upon the theory that appellants aided and abetted the target crimes of assault and disturbing the peace instead of the charged crimes of murder and attempted murder. I do not agree.
During deliberations, the jury asked the following question: "Must the defendant himself have `intentionally killed the victim' to prove special circumstances on page 67 of the jury instructions." (Italics added.) Page 67 was the CALJIC No. 8.81.22 instruction that defined the section 190.2, subdivision (a)(22) "intentional killing by an active street gang member" special circumstance.[7] This question suggests that the jury believed that the section 190.2, subdivision (a)(22) special circumstance allegation only applied to a defendant who personally fired the shots that killed the victims. Unfortunately, the trial court responded to the jury's question by merely rereading CALJIC instructions Nos. 8.80.1 and 8.81.22. It is reasonable to conclude, therefore, that the jury's rejection of the section 190.2, subdivision (a)(22) special circumstance was based upon the jury's belief that it could only find this special circumstance true as to the shooter and not those who aided and abetted. The jury's finding on this special circumstance, therefore, cannot be interpreted as a rejection of the theory that appellants aided and abetted in the charged crimes of murder and attempted murder, nor can it be interpreted as a finding by the jury that there was a reasonable doubt appellants intended to kill. It is also notable that the jury rejected the lesser included offense of involuntary manslaughter, an offense that did not require an intent to kill. This would strongly suggest that the jury determined that each appellant aided and abetted the charged crimes of murder and attempted murder.
The majority also reasons that the jury must have rejected the theory that appellants aided and abetted the target crimes of assault with a deadly weapon and assault by means of force likely to produce great bodily injury because the jury "was not persuaded that Richardo and Jesse intended for Rivera to fire his gun." This does not follow, however, since the jury made no such finding. Even assuming the jury's rejection of the section 190.2, subdivision (a)(22) special circumstance can be interpreted as a finding that appellants did not intend to kill, it still does not mean that the jury rejected the theory that appellants aided and abetted the target crimes of assault with a deadly weapon and assault by means of force likely to produce great bodily *229 injury. All of the target crimes are general intent crimes and none requires intent to kill. (People v. Parks (1971) 4 Cal.3d 955, 959 [95 Cal.Rptr. 193, 485 P.2d 257]; People v. Covino (1980) 100 Cal.App.3d 660, 669 [161 Cal.Rptr. 155].) The jury's rejection of the section 190.2, subdivision (a)(22) special circumstance had no bearing on the jury's determination that appellants intended to commit the target crimes of assault with a deadly weapon and assault by means of force likely to commit great bodily injury.[8] It should be noted that appellants do not contend that there was insufficient evidence to support instructions on the target crimes of assault with a deadly weapon and assault by means of force likely to produce great bodily injury nor do they contend that deadly violence is not a reasonably foreseeable consequence of the commission of these crimes.
The finding that the special circumstance allegation of multiple murder was true as to Jesse makes any argument of prejudice as to him even more tenuous. In order to find this allegation true, the jury had to find, if he was not the actual killer, that he aided, abetted or assisted in the commission of first degree murder with the intent to kill. (CALJIC No. 8.80.1.) The jury was instructed in CALJIC No. 8.80.1:
"If you find a defendant in this case guilty of murder of the first degree, you must determine if one or more of the following special circumstances are true or not true: Multiple Murders and Intentional Killing by a Street Gang Member.
"The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.
"If you find that defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor or co-conspirator, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill, aided, abetted, or assisted any actor in the commission of the murder in the first degree.
"You must decide separately as to each of the defendants the existence or nonexistence of each special circumstance alleged in this case. If you cannot *230 agree as to all of the defendants, but can agree as to one or more of them, you make your finding as to the one or more upon which you do agree.
"You must decide separately each special circumstance alleged in this case as to each of the defendants. If you cannot agree as to all of the special circumstances, but can agree as to one or more of them, you must make your finding as to the one or more upon which you do agree.
"In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously.
"You will state your special finding as to whether this special circumstance is or is not true on the form that will be supplied."
This instruction told the jury that it had to find that the defendant intended to kill in order to find the enumerated special circumstances true. Even though the jury's question, ante, suggests confusion about the section 190.2, subdivision (a)(22) "intentional killing by an active street gang member" special circumstance, when the jury found the multiple-murder special circumstance true as to Jesse, it necessarily determined that Jesse aided, abetted or assisted in the commission of first degree murder with the intent to kill.[9]
It is not reasonably probable that appellants would have obtained a more favorable result had the trial court not instructed on the target crimes of assault and disturbing the peace.

III. CONCLUSION
As one court observed almost 10 years ago, "... the nature of modern gang warfare is quite different. When rival gangs clash today, verbal taunting can quickly give way to physical violence and gunfire. No one immersed in the gang culture is unaware of these realities, and we see no reason the courts should turn a blind eye to them." (People v. Montes (1999) 74 Cal.App.4th 1050, 1056 [88 Cal.Rptr.2d 482].) As described in the evidence presented here, gang violence has become even more explosive.
*231 The trial court did not err in its instructions on aider and abettor liability, and, even if it did, appellants were not prejudiced.
I would affirm the judgment as to each appellant.
NOTES
[1] Defendants share a last name, as do two of the victims. We will therefore refer to those four individuals by their first names.
[2] All subsequent statutory references are to the Penal Code unless otherwise indicated.
[3] Thus, the jury found it was true that Richardo and Jesse committed the murders and the attempted murder for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in criminal conduct by gang members, but the jury found it was not true that Richardo and Jesse intentionally committed the murders while they were active participants in a criminal street gang and to further the activities of the gang.
[4] Our description of the facts differs in certain details from the description in our opinion in Rivera's appeal (People v. Rivera (Nov. 25, 2008, B197178) [nonpub. opn.])), because the evidence introduced at Richardo and Jesse's trial differs from the evidence introduced at Rivera's.
[5] At an Evidence Code section 402 hearing outside the presence of the jury, Ortega also testified that "Where are you from?" challenges happen "on a daily basis," that he personally has posed such challenges "many times," that such challenges can lead to a fistfight or a shooting "depending on what situation you're in," but that "most of the time" such challenges lead to "people saying their names and maybe a few bad words, and that's it."
[6] In her closing argument, the prosecutor suggested that the record might contain evidence that Richardo or Jesse was the shooter, but she said she would argue the case solely on the assumption that Rivera was the shooter, which she did.
[7] The defendant may or may not "be charged with the target crime in addition to the offense that is a natural and probable consequence thereof." (People v. Prettyman, supra, 14 Cal.4th at p. 268, fn. 6.)
[8] As the dissent notes, Rains testified that "a large majority" of the gang challenge cases "from West Valley that [he had] been working" led to "shootings and major injuries, attempt murders[, and murders]." Because Rains qualified this testimony by limiting it to the cases he had "been working," the testimony does not tend to prove that shootings, major injuries, murders, and attempted murders are reasonably foreseeable consequences of gang challenges. Rather, in order to draw any reasonable inferences from Rains's testimony we would need to know whether the gang challenge cases Rains had "been working" were a representative sample of gang challenges in general. For example, if (1) only a very small proportion of gang challenges actually result in homicide, but (2) Rains had "been working" only homicide cases, and (3) he testified that "a large majority" of the gang challenge cases he had "been working" involved homicide, then his testimony would prove nothing about whether homicide is a reasonably foreseeable consequence of a gang challenge. (We note that Rains is a homicide detective.) Conversely, if (1) most gang challenges actually result in homicide, but (2) a defense expert studied only nonfelonious conduct by gang members, and (3) the expert testified that not one of the gang challenges he had studied led to homicide, then his testimony too would prove nothing about whether homicide is a reasonably foreseeable consequence of a gang challenge. Thus, without more information about whether the gang challenge cases Rains had "been working" were a representative sample of gang challenges in general, his testimony cannot support a reasonable inference that shootings, major injuries, murders, and attempted murders are reasonably foreseeable consequences of gang challenges.
[9] We note that Richardo's disrespectful staring preceded the "Where are you from?" challenge and that after Miguel identified himself as a "Temple Street" gang member, the shooter said "Fuck Temple" before drawing his gun and opening fire. While the jury could reasonably infer that the staring and the shooter's verbal response made a violent confrontation still more likely than it otherwise would have been, the jury could only speculate about the extent to which those circumstances made a shooting or homicide more likely, or likely at all. None of the prosecution's expert testimony supported the necessary inferences. On the contrary, Ortega testified that even when Rivera said "Fuck Temple," he (Ortega) still "thought there was going to be a fist fight" and "didn't think there was going to be any kind of shoot-out." The defense expert testified that even after the insult to Miguel's gang, "the most probable thing to happen" would be a fistfight.
[10] The record contains evidence that the confrontation in this case involved gang rivalry. Lukaszewski testified that "any gang that would come into" the Canoga Park Alabamas' territory would be a rival. Lukaszewski also testified that Vanowen "would be considered a rival" of the Canoga Park Alabamas, and Ortega identified his gang as Vanowen Street.
[11] Jesse did state in his postarrest interview that he "was scared someone was going to take out a gun," though he did not say whether he was "scared" that a gun would be produced by one of his confederates. Jesse's having been "scared" has no tendency to prove that the use of a gun was a natural and probable consequence, because people can be "scared" of any number of possible consequences that are nonetheless too remote to be reasonably foreseeable. In contrast, Ortega's testimony that he "thought there was going to be a fist fight" and "didn't think there was going to be any kind of shoot-out," and Jesse's "startled and surprised" reaction when the gun was drawn, tend to show that a fistfight was reasonably foreseeable but the use of a gun was not.
[12] In Godinez, the trial court affirmatively instructed the jury that a homicide is a natural and probable consequence of a "gang attack." The court thereby removed the natural and probable consequences determinationwhich is an issue of factfrom the jury's consideration. The Court of Appeal held that was error because, although the evidence was sufficient to support a factual finding that a homicide was a natural and probable consequence of the attack in that case, the evidence did not require such a finding, and a court cannot "conclude as a matter of law that homicide is always a foreseeable consequence of any gang attack." (People v. Godinez, supra, 2 Cal.App.4th at pp. 499-502.)
[13] The Supreme Court recently granted review on this issue in a case that dealt with a homicide resulting from a melee that began with the verbal challenge, "Where are you from?" (People v. Medina (2007) 153 Cal.App.4th 610 [63 Cal.Rptr.3d 203], review granted Oct. 31, 2007, 67 Cal.Rptr.3d 468 [169 P.3d 889].) The Court of Appeal concluded there was insufficient evidence to sustain the murder convictions of two accomplices who were found guilty on a natural and probable consequences theory. Even that case is distinguishable, however, because there too the accomplices were direct participants in a brawl with the victim. There are no such facts in the case before us.
[14] We note that, although the jury appears to have rejected the direct aiding and abetting theory, the record appears to contain substantial evidence to support that theory. Ortega testified that during the shooting both Richardo and Jesse continued to make hand signals identifying themselves as Canoga Park Alabamas. A jury could reasonably infer that such conduct shows that Richardo and Jesse intended to (and did) aid, promote, encourage, or instigate the murders and the attempted murder. Because the jury rejected the intentional killing by a gang member special circumstance, however, it appears that the jury did not draw that inference, perhaps because the jury rejected Ortega's testimony on this point or credited his testimony that both Richardo and Jesse looked "startled and surprised" when the gun came out. In any event, because the jury appears to have rejected the direct aiding and abetting theory, the existence of substantial evidence to support that theory does not affect our prejudice analysis.
[15] The jury's rejection of the allegation that Richardo and Jesse intentionally committed the murders while active gang members does not mean that the jury found as a matter of fact that Richardo and Jesse did not intend the murders. (People v. Santamaria (1994) 8 Cal.4th 903, 918-919 [35 Cal.Rptr.2d 624, 884 P.2d 81].) Thus, although the jury's rejection of the intentional killing by a gang member special circumstance precludes retrial of that allegation, it does not preclude the prosecution from retrying the murder charges against Richardo and Jesse on the theory that they intended the murders. (Id. at pp. 910, 926.)
[16] This argument does not apply to Richardo, because the jury found the multiple-murders special circumstance not true as to him.
[17] The version of CALJIC No. 8.80.1 that was given to the jury states in relevant part:

"If you find a defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true: Multiple Murders and Intentional Killing by a Street Gang Member.
"The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.
"If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor or co-conspirator, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill, aided, abetted, or assisted any actor in the commission of the murder in the first degree."
[18] CALJIC No. 8.80.1 states in relevant part:

"If you find [the] [a] defendant in this case guilty of murder of the first degree, you must then determine if [one or more of] the following special circumstance[s]: [is] [are] true or not true: ...
"The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.
"[[Unless an intent to kill is an element of a special circumstance, if] [If] you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true.]
"[If you find that a defendant was not the actual killer of a human being, [or if you are unable to decide whether the defendant was the actual killer or [an aider and abettor] [or] [co-conspirator],] you cannot find the special circumstance to be true [as to that defendant] unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill [aided,] [abetted,] [counseled,] [commanded,] [induced,] [solicited,] [requested,] [or] [assisted] any actor in the commission of the murder in the first degree] [.]"
[19] We note that even when given in compliance with the use notes, CALJIC No. 8.80.1 is extremely confusing and difficult to follow. In contrast, CALCRIM No. 702, which deals with the intent to kill requirement for special circumstances that do not include intent to kill as an element (as applied to defendants other than the actual killer), is admirably clear. It specifically identifies the special circumstances at issue and says that if the defendant is not the actual killer then in order to find those special circumstances true the jury must find the defendant acted with intent to kill. (CALCRIM No. 702.) CALJIC No. 8.80.1's opacity and CALCRIM No. 702's lucidity thus illustrate why the use of CALCRIM "is strongly encouraged." (Cal. Rules of Court, rule 2.1050(e); see also ibid. ["it is recommended" that CALCRIM be used unless the judge "finds that a different instruction would more accurately state the law and be understood by jurors"].)
[*] Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] Jesse Martinez and Richardo Martinez will be referred to by their first names hereafter for the sake of simplicity.
[2] There is some conflict in the record whether it was Rivera or Richardo who asked "Where are you from" and said "Fuck Temple." This conflict in the evidence, of course, was for the jury to evaluate and resolve.
[3] The unintentional killing of a human being during the commission of an unlawful act, i.e., misdemeanor assault and disturbing the peace, without due caution and circumspection.
[4] All statutory references are to the Penal Code.
[5] Here the jury was instructed pursuant to CALJIC No. 3.02:

"One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.
"In order to find the defendant guilty of the crimes of Murder & Attempted Murder as charged in Counts 1-3, you must be satisfied beyond a reasonable doubt that:
"1. The crime or crimes of Breach of Peace or Assault or Assault w/ Force Likely to Cause Great Bodily Injury or Assault w/ a Firearm were intended;
"2. That the defendant aided and abetted those crimes;
"3. That a co-principal in that crime committed the crimes of Murder & Attempted Murder; and
"4. The crimes of Murder & Attempted Murder were a natural and probable consequence of the commission of the crimes of Breach of Peace or Assault or Assault w/ Force Likely to Cause Great Bodily Injury or Assault w/ [a] Firearm.
"In determining whether a consequence is `natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A `natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. `Probable' means likely to happen."
"You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the [crimes] of Murder and Attempted Murder were a natural and probable consequence of the commission of that target crime."
[6] Although Ortega testified that appellants had startled expressions when the shooting occurred, the jury also learned that Ortega did not know appellants and had never seen them before. A jury could reasonably infer that the looks on their faces were of excitement or some other emotion, rather than that of being startled.
[7] The instruction began: "To find that the special circumstance `intentional killing by an active street gang member' is true, it must be proved: [¶] 1. The defendant intentionally killed the victim...."
[8] This analysis is consistent with the jury's verdict of guilty of first degree murder and attempted premeditated murder since the jury was instructed that, regardless of the extent or manner of participation, those who directly and actively commit the act constituting the crime (Rivera) and those who aid and abet (appellants) are equally guilty. (CALJIC No. 3.00.)
[9] We are left to speculate why the jury did not find the multiple-murder special circumstance true as to Richardo even though he was also convicted of two counts of first degree murder. "`The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.'" (Dunn v. United States (1932) 284 U.S. 390, 393 [76 L.Ed. 356, 52 S.Ct. 189].)