63 Cal.Rptr.3d 203 (2007)
153 Cal.App.4th 610
The PEOPLE, Plaintiff and Respondent,
v.
Jose Jesus MEDINA et al., Defendants and Appellants.
No. B189049.
Court of Appeal of California, Second District, Division Four.
July 23, 2007.
*204 Chris R. Redburn, under appointment by the Court of Appeal, San Francisco, for Defendant and Appellant Jose Jesus Medina.
John Steinberg, under appointment by the Court of Appeal, Berkeley, for Defendant and Appellant George J. Marron.
Mark D. Lenenberg, under appointment by the Court of Appeal, Simi Valley, for Defendant and Appellant Raymond Vallejo.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Joseph P. Lee and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]
SUZUKAWA, J.

INTRODUCTION
Defendants Jose Jesus Medina, George J. Marron, and Raymond Vallejo appeal from the judgment entered following the jury verdict convicting them of first degree murder and attempted willful, deliberate, and premeditated murder. (Pen.Code, §§ 187, subd. (a); 664, subd. (a)/187, subd. (a).)[1] The jury found that during the commission of the crimes a firearm was used and intentionally discharged, and in the case of the murder, that the discharge caused great bodily injury or death to the victim. The jury also determined that the crimes were committed with the intent to benefit a criminal street gang. (§§ 12022.53, subds. (b) through (e); *205 186.22, subd. (b)(1).) Defendants were sentenced to the state prison for a term of 50 years to life.[2]
Defendants Marron and Vallejo argue there is insufficient evidence to support their convictions. All defendants allege the trial court erred when it denied their Wheeler-Batson motion[3] and admitted hearsay testimony. They also claim there is insufficient evidence to support the jury finding on the gang enhancement, and the court should not have imposed sentence for the gang enhancement.[4]
We reverse the convictions of Marron and Vallejo. As to Medina, we reject his claims and affirm.

STATEMENT OF FACTS
On January 2, 2004, Manuel Ordenes and his wife, Amelia Rodriguez, were having a party at their home in Lancaster. Guests came and went during the course of the day. By the late evening, Ordenes, Rodriguez, neighbors Kirk and Abraham, a friend Lisa, Falcon, and defendants were present in the home. Everyone was drinking and consuming methamphetamine.
Defendants were self-admitted members of the Lil Watts gang, as each had told Ordenes that he was a member. The gang primarily claims an area of the city of Hawthorne. Ordenes was a former member of the Lennox gang, a rival of Lil Watts.
Sometime around 11:00 p.m, the victim, Ernie Barba, knocked on the front door. Someone in the house yelled "Who is it?" or "Who is that?" Either Ordenes or his wife opened the door. Falcon and defendants got up from the table and approached Barba. Someone in the house asked, "Where are you from?" Ordenes knew from his prior gang experience that asking that question was an "aggression step" designed to ascertain if the target of the question was a gang member. He stated that if the target was a rival gang member, the question could lead to a fight or "whatever else would happen." When asked by the prosecutor what other things could happen, Ordenes responded, "Well, death."
As defendants continued toward Barba, they continued to ask, "Where are you from?" Barba replied, "Sanfer," signifying the San Fernando gang. Vallejo responded with "Lil Watts." Medina said, "What fool, you think you crazy?" As the war of words escalated, Ordenes told them to take their disagreement outside. Once outside, Vallejo threw the first punch at Barba, and defendants and Barba engaged in a fistfight in front of the door of the house.
Ordenes attempted to break up the fight. He had some difficulty in doing so, as he would grab one defendant, but the others would continue fighting. At one point, Falcon tried to restrain Ordenes from behind. Eventually, Ordenes was able to get Barba away from defendants and walk him to Barba's car.
Barba got into the driver seat, and his friend, Crystal Varela, got into the passenger seat. Varela heard someone in the area of the yard say, "Get the heat." She understood "heat" to mean gun. Ordenes *206 opened the passenger door, and Barba asked him why he let the fight happen. Ordenes told Barba that he would take care of the situation. He told Barba to leave. As Barba drove away, Varela heard something break through the back window of the car. She noticed that Barba began "shivering," and the car listed to the side of the street and crashed. Barba fell toward Varela. She noticed blood everywhere. She managed to take control of the car, and eventually drove it around the corner to a friend's house. Barba's wound was fatal.
Ordenes was walking back toward his house when he heard the gunshots, but he did not see who was shooting. Just prior to the shots, he heard Lisa screaming, "Stop, Tiny. No, stop." "Tiny" is Medina's gang moniker.
Rodriguez saw Medina walk into the middle of the street, raise his hands in a manner consistent with shooting a gun, and point in the direction of Barba's car. She then heard gunshots. Lisa, who was standing next to Rodriguez yelled, "Tiny, you know, you're stupid. Why you doing that? There's kids here. You `fd' up."
Despite hearing gunshots, neither Ordenes nor Rodriguez saw a gun that night. After the shooting, they went into the house to check on their children. They did not see where defendants went. Neither called the police. When police arrived at their home to question them, they denied knowing anything about the shooting. They were scared and did not want to get involved. Ordenes knew from his gang experiences that he did not want to be labeled a snitch, and defendant Marron lived in the house behind him. During subsequent interviews with police, Ordenes and Rodriguez told them what each had seen on the night of the shooting.
Hawthorne Police Officer, Christopher Port, testified as the prosecution's gang expert. He was assigned to the Gang Intelligence Unit, and was familiar with the Lil Watts gang. According to the officer, the gang claims the Hawthorne area and has 150 documented members. The types of crimes Lil Watts gang members primarily commit include vandalism, drive-by shootings, assaults with firearms, narcotics sales, and homicides. Officer Port testified that he had conversations with other gang officers who determined that defendants were members of the Lil Watts gang. He also noted that another member of the gang had previously been convicted of assault with a deadly weapon.
The prosecutor asked Officer Port if there was a typical response to a gang member asking another suspected gang member the question, "Where are you from?" Port replied, "Usually it's some form of misunderstanding that can go into some physical altercation. They can go from a fistfight to disrespecting each other as far as verbally and all the way as far as to homicide." He further opined that a gang member who asked that question could be armed, and would "probably [be] prepared to be in some form of altercation following the answer." Officer Port testified that the shooting was perpetrated for the benefit of a criminal street gang.

DISCUSSION

I. The Court Properly Denied Defendants' Wheeler-Batson Motion[**]

II. The Evidence Is Insufficient to Sustain the Convictions of Marron and Vallejo
Defendants Marron and Vallejo were convicted of murder and attempted murder under the prosecution's theory *207 that they aided and abetted an assault on Barba and the shooting, which resulted in Barba's murder and Varela's attempted murder, was a natural and probable consequence of that assault. Marron and Vallejo contend the evidence is insufficient to establish that Medina's act of shooting at Barba's vehicle was a natural and probable consequence of the fistfight that took place outside Ordenes's front door. We agree.
In evaluating whether a conviction is supported by the evidence, we determine whether the trier of fact could rationally find defendants guilty beyond a reasonable doubt. We must view the evidence in the light most favorable to the prosecution and must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. (People v. Ochoa (1993) 6 Cal.4th 1199, 1206, 26 Cal.Rptr.2d 23, 864 P.2d 103.)
The Supreme Court has set forth the test for determining whether a committed crime is a natural and probable consequence of the intended target crime. "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable. (People v. Prettyman [ (1996) ] 14 Cal.4th at pp. 260-262[, 58 Cal.Rptr.2d 827, 926 P.2d 1013].)" (People v. Mendoza (1998) 18 Cal.4th 1114, 1133, 77 Cal. Rptr.2d 428, 959 P.2d 735.)
The prosecution built its case around the fact that before the fight broke out between Barba and defendants, someone in Ordenes's house asked, "Where are you from?" The prosecution elicited testimony from Ordenes that when a gang member asked that question, it represented an act of aggression. According to Ordenes, if the question was posed to a rival gang member, it would likely lead to a fight or "whatever else would happen." When asked whatever else could happen, Ordenes stated, "Well, death." Officer Port, the gang expert, opined the question could lead to a "misunderstanding that can go into some physical altercation. They can go from a fistfight to disrespecting each other as far as verbally and all the way as far as to homicide." He also testified, "When gangs have a disagreement, you can almost guarantee it's going to result in some form of violence, whether that be punching and kicking or ultimately having somebody shot and killed."
The Attorney General contends that "the courts have generally found that due to the nature of [gang] conflicts, the evidence may show that it is reasonably foreseeable some gang members will carry guns during those encounters and that a shooting may result as a consequence of verbal challenges and fistfights." Defendants respond that finding Barba's death was a natural and probable consequence of the fistfight in this case is tantamount to imposing strict liability for the actions of all gang members.
As gang violence has become more prevalent and innocent bystanders have become victims of the violence in ever increasing numbers, our courts have recognized that a dispute between two neighbors and one between two gang members can lead to different consequences. "When rival gangs clash today, verbal taunting can quickly give way to physical violence and gunfire. No one immersed in the gang culture is unaware of these realities, and we see no reason the courts should turn a blind eye to them." (People v. Monies (1999) 74 Cal.App.4th 1050, 1056, 88 Cal.Rptr.2d 482.) Notwithstanding *208 that this case involves gang members, the question is whether the shooting that led to Barba's death, "judged objectively, ... was reasonably foreseeable." (People v. Mendoza, supra, 18 Cal.4th at p. 1133, 77 Cal.Rptr.2d 428, 959 P.2d 735.) When we evaluate the cases that have discussed the issue, even those in the context of gang violence, we must answer no.
Initially, we note that the federal cases cited by defendants are inapplicable. The cases discuss the theories of aiding and abetting (Juan H. v. Allen (9th Cir.2005) 408 F.3d 1262; Mitchell v. Prunty (9th Cir.1997) 107 F.3d 1337) and conspiracy (U.S. v. Garcia (9th Cir.1998) 151 F.3d 1243), neither of which serve as the basis of liability here. Although U.S. v. Andrews (9th Cir.1996) 75 F.3d 552, 556 concludes that the evidence was insufficient under the "`natural and probable consequences' doctrine," the theory under federal law is that a "defendant is presumed to have intended the natural and probable consequences of his or her acts." (U.S. v. McInnis (9th Cir.1992) 976 F.2d 1226, 1234.) This, of course, is different from our doctrine which makes the aider and abettor liable for the acts of another.
The Attorney General relies on two cases. In People v. Gonzales (2001) 87 Cal.App.4th 1, 104 Cal.Rptr.2d 247, two defendants argued there was insufficient evidence to sustain their convictions for murder under the natural and probable consequences theory. There was a fistfight between three gang members on one side (which included the two defendants) and two suspected rival gang members on the other. During the fight, the defendants' cohort shot and killed one of the rivals. Gonzales argued he could not be liable for murder because he did not know his fellow gang member had a gun. Finding that the relevant inquiry was whether the shooting was a reasonably foreseeable consequence of the fight, the court noted that there was substantial evidence that all defendants knew, at the onset of the fight, that the shooter had a gun as he ran toward the victim. During the course of the skirmish, the men grappled for the gun, and one of the defendants yelled, '"shoot him.'" (Id. at p. 11, 104 Cal. Rptr.2d 247.) The court concluded the non-shooting defendants were properly convicted.
In People v. Montes, supra, 74 Cal. App.4th 1050, 88 Cal.Rptr.2d 482, a fight took place when two gang members encountered Montes's rival gang at a parking lot of a fast food restaurant. The two gangs had an ongoing dispute. Two months earlier, in the same parking lot, Montes had confronted the same two rivals, and had struck one of them with a stick. The new dispute started with insults and quickly escalated when the target of the insults produced a switchblade. Other weapons were produced, and ultimately one of Montes's fellow gang members pulled out a gun and shot the man with the switchblade.
Montes's conviction of the attempted murder perpetrated by the shooter was affirmed under the theory of natural and probable consequences. Noting that there had to be a close connection between the target crime aided and abetted and the offense committed, the court concluded: "Under the circumstances presented in this case, the targeted offenses of simple assault and breach of the peace for fighting in public were not trivial. They arose in the context of an ongoing rivalry between OKM and VPL during which the two gangs acted violently toward each other. This feud spilled over on the night in question when Montes and his gang confronted Garcia in the parking lot. From the start, the confrontation was punctuated by threats and weaponry. And when it *209 was clear the chain-wielding Montes and his gang were too much for Garcia, Flores shouted something about a gun, which in turn prompted Cuevas to obtain a firearm and shoot Garcia." (People v. Montes, supra, 74 Cal.App.4th at p. 1055, 88 Cal. Rptr.2d 482.) The court had no difficulty finding that the assault and breach of the peace were closely connected to the shooting.
An examination of cases where the evidence was deemed sufficient to convict the defendant under the natural and probable consequences theory include similar facts. In People v. Godinez (1992) 2 Cal.App.4th 492, 3 Cal.Rptr.2d 325, Godinez was involved in a fight wherein his gang buddies outnumbered the sole rival. Witnesses said Godinez threw the first punch. After the victim fell to the ground, Godinez and his companions hit and kicked the defenseless victim, who was stabbed seven times during the melee, and ultimately succumbed to his wounds. When police sirens caused the gang to disperse, Godinez returned to the victim. One witness said Godinez kicked the victim, while another said the person who returned also "made stabbing motions on the prostrate victim." (Id. at p. 496, 3 Cal.Rptr.2d 325.) (See People v. Karapetyan (2006) 140 Cal. App.4th 1172, 45 Cal.Rptr.3d 245 [murder was a natural and probable consequence of an assault where defendant and others, with weapons at their disposal, attacked a lone unarmed victim]; People v. Olguin (1994) 31 Cal.App.4th 1355, 37 Cal.Rptr.2d 596 [non-shooting defendant punched victim once in the face, who rose from the ground and was shot by another defendant; there was evidence non-shooting defendant knew of the presence of the gun]; People v. Montano (1979) 96 Cal.App.3d 221, 158 Cal.Rptr. 47 [non-shooting defendant and others kidnapped rival gang member for the purpose of beating him; non-shooter was found liable for the shooting that took place even though he was not present at the time, as the trial court found all defendants agreed "to waste" the rival].)
In evaluating the cited cases, several facts emerge which support the courts' conclusions that each defendant was liable for the committed crime under the natural and probable consequences theory: 1) the defendant had knowledge of the weapon that was used before or during his involvement in the target crime; 2) the committed crime took place while the target crime was being perpetrated; 3) weapons were introduced to the target crime shortly after it ensued; 4) the fight which led to the committed crime was planned; 5) the gangs were engaged in an ongoing rivalry involving past acts of violence; or 6) the defendant agreed to or aided the commission of the committed crime. In all of the cases, more than one of these facts were present.
When we scrutinize the instant case, we find no such facts. The fight here was not planned. Defendants were celebrating at a party. The victim, who had been at the house some five hours earlier, dropped by to pick up a compact disc. The fight started when the victim showed up unannounced at the door. The two gangs involved were not in the midst of a "war." In fact, the gangs were not remotely from the same geographical area. Defendants' gang territory is in Hawthorne and Barba's gang is located in the north San Fernando Valley. There was no evidence of any prior acts of violence between the gangs. There were no weapons involved during the fight. There was no evidence from which the jury could conclude that Marron and Vallejo knew or should have known that Medina had a gun. Indeed, there was no evidence that anyone had a weapon of any kind prior to the shooting. The fistfight had ended, and enough time *210 had passed for Ordenes to escort Barba to his car and engage him in a short conversation before Barba drove away from the location. Medina stood in the street when he shot the victim, and no one testified as to where Marron and Vallejo were at that time. There was no evidence that all three defendants discussed shooting the victim, let alone agreed to do so. There was also no evidence that Marron and Vallejo encouraged the shooting or were even aware that it was about to take place. There were no threats made to the victim before, during, or after the fight.
The only piece of evidence that might support an inference that someone other than Medina knew the shooting would take place was Varela's testimony that she heard someone say, "Get the heat," just prior to the sound of gunfire. However, we do not know who made the comment, and the statement was made after the fight had ended. This speculative evidence is clearly insufficient to support a finding that Medina's act of firing a gun was a reasonably foreseeable outcome of the fistfight.
In order to find Marron and Vallejo responsible for Barba's murder, we would have to accept the Attorney General's argument that all participants in a fistfight between gang members that is precipitated by the well-worn phrase "where you from?" must reasonably foresee that someone will die. Notwithstanding the violence which most gang confrontations spawn, on our facts, viewed objectively, we cannot conclude that an unplanned fight between unarmed combatants in front of a residence was reasonably likely to lead to a shooting resulting in death. In essence, the Attorney General is asking us to create a new theory of liability. An aider and abettor would be responsible for any crime that was a natural and possible consequence of the target crime. That, we cannot do.[6]

III.-V.[***]

DISPOSITION
The convictions of defendants Marron and Vallejo are reversed. The judgment as to defendant Medina is affirmed.
WILLHITE, Acting P.J., and MANELLA, J., concur.
NOTES
[*] Under California Rules of Court, rules 8.1105 and 8.1110, only the Introduction, Statement of Facts, Discussion, part II, and the Disposition are certified for publication.
[1] All statutory references are to the Penal Code.
[2] The jury acquitted Jason Falcon, a fourth defendant who was jointly charged and tried.
[3] People v. Wheeler (1978) 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748. Batson v. Kentucky (1986) 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.
[4] Each defendant joined in all contentions raised by his codefendants to the extent they were applicable to his appeal.
[**] See footnote *, ante.
[6] Given our conclusion, we do not address Marron's and Vallejo's claims of instructional error.
[***] See footnote *, ante.